UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | No. 19-CR-00293-1 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| TONY GREEN, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

In April 2017, law enforcement agents were on surveillance in a west-side neighborhood of Chicago. The target of the surveillance was a specific car that agents had tailed to the neighborhood. Tony Green got in and out of the car, and based on the surrounding circumstances and what the agents saw him do, the agents believed that Green had just engaged in a drug deal. Green drove away in his own car; the agents followed. Green ran through two stop signs, prompting the agents to stop his car. In a search of the car, the agents found bags of heroin.

Green now faces a charge of possessing the heroin with the intent to distribute it. 21 U.S.C. § 841(a)(1); R. 1, Indictment.[1] Green has moved to suppress everything that was found during the search of his car, as well as the verbal statements that he made right after the stop, plus the verbal and written statements made later at a police station. R. 52. To resolve the factual disputes, the Court held an evidentiary

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

hearing, during which three agents testified. After considering the evidence, the testimony, and the parties' post-hearing briefs, the Court denies the motion for the most part and grants it in limited part.

## I. Background

On the morning of April 11, 2017, members of a Drug Enforcement Administration Strike Force were surveilling 4828 West Cortez Street on Chicago's west side. R. 63, Tr. at 7:20–8:20. The task: to identify the driver of a particular Mini Cooper. *Id.* at 31:5–8. The lead case agent was Agent Tom Asselborn. *Id.* at 31:15–16. Among the other agents on the surveillance team that morning were Task Force Officer George Brown, Agent Don Wood, and Task Force Officer Greg Lecas; all three of whom testified at the evidentiary hearing. *Id.* at 7:20–25, 8:19–22.

It was no accident that the agents were on the lookout for the Mini Cooper. Before that day's surveillance, the government had submitted an affidavit in successfully asking for court authority to install a GPS tracker on the car. Tr. 15:8–9; *see* Tr. at 23:20–24. (The government provided a copy of the affidavit to the Court and to defense counsel, but chose not to rely on its contents in the interests of protecting other investigations. *Id.* at 23:20–24:3. So the fact that the Mini Cooper was already of interest to the DEA adds nothing to the quantum of suspicion, *id.* at 26:20–24, which made this a much, much closer call than it otherwise would have been.) Agent Asselborn, the lead case agent, saw the Mini Cooper leave the residence at 4828 West Cortez. *Id.* at 9:16–25. He radioed out to other Strike Force members that the Mini Cooper had left a garage. *Id.* at 9:22–25. After leaving that address, the Mini Cooper

parked on the 4700 block of West Maypole Avenue. *Id.* at 10:5–18. (Google Maps says that 4700 West Maypole is around 1½ miles from 4828 West Cortez.)

With the Mini Cooper now parked on the 4700 block of West Maypole, Task Force Officer Brown parked about a half-block behind the car; Brown was in an unmarked vehicle. *Id.* at 10:6–20. Visibility was clear that day and nothing obstructed Brown's view of the Mini Cooper. *Id.* at 10:21–24. Brown saw a Black man walk up to the Mini Cooper, get into its passenger side, and get out of the car within less than one minute of getting in. *Id.* at 11:1–24. This man turned out to be Defendant Tony Green. *Id.* at 11:23–12:5. As Green got out of the Mini Cooper, Brown noticed him clutching his hoodie's pocket. *Id.* at 11:11–15. Brown then saw Green, still clutching his sweatshirt, walk over to a Pontiac G6, and drive away. *Id.* at 11:4–22.

To Officer Brown's thinking, this under-minute encounter, ending with Green clutching his pocket, was a drug deal. Tr. at 12:13–19. Brown based this belief on two things: first, his experience observing similar in-and-out encounters in a car. *Id.* at 12:15–16 ("Because I've seen it occur on several occasions when someone gets in the car and gets right back out."). Second, "this specific area" is a "heavy narcotics purchasing area." *Id.* at 12:17–19. Brown had worked in the area before, and based on that experience, he knew that the area had a "[h]igh volume of narcotics and crime." *Id.* at 8:6–9, 9:8–15. Agent Wood, too, credibly testified that this "area was known for that kind of activity," meaning quick hand-to-hand drug deals inside a car. *Id.* at 35:1–14. So did Officer Lecas, who was "familiar" with that area based on his work as a law enforcement officer, and who knew "[t]hat area was known to be an area of

3

… high-volume drug trafficking." *Id.* at 72:12–18. Returning to the surveillance: all the while when Brown was watching the Mini Cooper and Green, Brown maintained radio communication with other Strike Force members and relayed what he was seeing. *Id.* at 13:1–9, 33:17–34:5. He also radioed out that he believed that the person (now known as Green) who had gotten in and out of the Mini Cooper had participated in a drug deal. *Id.* at 13:1–3.

Still on the scene, Brown then saw another Black man walk up to the Mini Cooper, get into the passenger seat, get right back out, and walk away to another vehicle while clutching his pants. Tr. at 13:1–12. Based on the same in-and-out nature of the encounter and the pants clutching, Brown believed that the second man too had engaged in a drug deal—which in turn strengthened Brown's suspicions as to Green. *Id.* 13:10–25, 14:15–22. Agent Wood and Task Force Officer Lecas, who were parked elsewhere, testified that based on Brown's radio description of these events and where they happened, they also suspected that Green had engaged in a drug deal. *Id.* at 34:20–36:16; 72:19–73:16.

After getting into the Pontiac, Green drove away from West Maypole. Tr. at 13:1–3. Agent Wood, Agent Norris, and Officer Lecas attempted to follow. *Id.* at 36:20–25. Lecas first spotted the Pontiac heading east on Kinzie Street. *Id.* 73:17–74:2. Not all went smoothly, however, because Lecas then called out via radio that he believed Green had noticed him following. *Id.* at 37:2–5. Lecas maintained about a half-block distance from the Pontiac until he "saw the vehicle not come to a complete stop at a stop sign." *Id.* 74:21–23. He then informed the Strike Force via radio that

4

he had probable cause to make a traffic stop. *Id.* at 37:12–15, 74:22–23. Agent Asselborn instructed Lecas to wait for other units to help. *Id.* at 37:24–38:2, 75:1–3. Lecas continued to follow the Pontiac east on Kinzie until another member of the Strike Force announced that this other agent was close by enough to help with the traffic stop. *Id.* at 75:7–9. Now the chase was on, so Lecas turned on his lights and siren and continued pursuit. *Id.* at 75:10–15.

At the intersection of Kinzie and Keeler, the Pontiac drove through the stop sign there—now the second blown stop sign. Tr. at 75:14–25. Special Agent Norris, arriving northbound on Keeler, drove into the intersection to cut off the Pontiac. *Id.* at 76:5–14. After the Pontiac came to a stop, Officer Lecas (who had arrived on the scene) approached Green and asked for a driver's license.[2] *Id.* 76:19–77:3. Green replied that his license was suspended and instead showed his Illinois identification card. *Id.* at 77:6–7. Lecas then asked Green if "there was anything on his person or in the vehicle that shouldn't be in the vehicle." *Id.* at 77:20–21. Green responded that there was "dope" in the car. *Id.* at 77:23–24. At this point, Green was handcuffed and arrested. *Id.* at 78:1–4. When asked where the drugs were located, Green answered

---

[2]Green submitted an affidavit with his suppression motion that raised some factual disputes against the officers' version of the traffic stop. R. 54, Def. Aff. When it came down to it, however, Green chose not to testify at the suppression hearing. Of course, he is under no obligation to do so, and the Rules of Evidence do not strictly apply at suppression hearings. *United States v. Matlock*, 415 U.S. 164, 173–74 (1974); Fed. R. Evid. 104(a), 1101(d). But Green's decision not to testify means that he could not support the affidavit with credible, live direct testimony, nor were his proffered facts testable by cross-examination. So the affidavit's probative force is much, much less than the live testimony of the agents who testified under oath and were subject to cross-examination.

that they were in the center console. *Id.* at 78:4–6. Lecas looked there and found a plastic bag containing several smaller bags of heroin. *Id.* at 78:8–17.

After seizing the heroin, the Strike Force transported Green to the Chicago Police Department's 15th District station. Tr. at 78:23–25. There, Green waived his *Miranda* rights and signed a waiver-of-rights form, Gov. Exh. 4, and he said that he wanted to cooperate with law enforcement, Tr. at 47:2–25. Green also signed a Consent to Search Form for two cell phones, Gov. Exh. 5, a Waiver of Initial Appearance, Gov. Exh. 6, and a Cooperation Agreement, Gov. Exh. 7. *Id.* at 48:15–53:6. As part of his cooperation, Green admitted that he had known the person in the Mini Cooper for around 10 years and, for the past two months, had been receiving distribution-quantities of heroin from him every day. *Id.* at 53:20–54:15. Green would then take this heroin to supply three drug spots in Chicago. *Id.* at 54:14–20. After this post-arrest interview, Green was released without charges, in the hopes of ongoing cooperation with the agents. *Id.* at 55:10–15. Ultimately, however, in January 2020, Green was charged with possession of heroin with intent to distribute it. R. 23. He moves to suppress everything found in the car, the verbal statements that he made right after the stop, and the verbal and written statements that he made at the police station and afterwards.

## II. Analysis

### A. Reasonable Suspicion & Probable Cause

Green first argues that the DEA Strike Force lacked probable cause or reasonable suspicion to stop his car and to search it. Def. Mot. Supp. at 3. The Fourth

6

Amendment protects individuals against unreasonable searches and seizures. Even so, "an investigatory stop, which constitutes only a limited intrusion into an individual's privacy, is reasonable, and therefore permissible, if the officer making the stop is able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Mays*, 819 F.3d 951, 955 (7th Cir. 2016) (cleaned up).[3] Reasonable suspicion requires "more than a hunch," but need not rise to the more-demanding standard of probable cause. *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Mays*, 819 F.3d at 955 (cleaned up). The evaluation of the circumstances is "based on common-sensical judgments and inferences about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

Moving beyond a brief investigatory stop, a police officer must have probable cause to make a full-blown arrest. Probable cause exists if the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). In deciding whether an officer had probable cause

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

7

for an arrest, courts consider the totality of the circumstances from the perspective of a reasonable person in the position of the officer. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008); *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005).

### B. Traffic Stop

First up is whether the Strike Force had reasonable suspicion to initiate a traffic stop. "The Fourth Amendment permits officers to conduct a traffic stop when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020) (cleaned up). Additionally, "reasonable suspicion of a traffic violation provides a sufficient basis to justify a traffic stop." *Id.* Reasonable suspicion must be supported by "specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). To assess whether there is reasonable suspicion for a stop, courts must "evaluate, under an objective standard, the totality for the circumstances known to [the officer] at the time and determine if a reasonable officer in those circumstances would have been suspicious." *Mays*, 819 F.3d at 957.

Here, the key facts are worth revisiting. Officer Brown was surveilling the Mini Cooper, specifically in an area in which he had worked before and which he knew to have a "[h]igh volume of narcotics and crime." Tr. at 8:6–9, 9:8–15. He then saw Green get in and out of the passenger side of the car, all in less than one minute. *Id.* at 11:1–3, 11:23–12:5. After Green got out, he was clutching his hoodie's pocket. *Id.* at 11:1–6. Based on Brown's experience in observing drug deals, coupled with the area's high

8

volume of drug sales, Brown believed that Green engaged in a drug deal. *Id.* at 12:13–19. Indeed, Brown had "worked over there and seen numerous narcotics transactions over there." *Id.* at 14:3–4.

If that were the totality of the evidence—one person quickly getting in and out of the Mini Cooper and receiving something from the car's driver, plus the high drug crime in the area—then almost surely the agents did *not* have reasonable suspicion that a drug deal had just happened. Even in a high-drug-sales area, just getting in and out of a car and then clutching something afterwards is not very much to go on. It just means that one person received something from another inside a car, albeit in a high-drug-sales area. It would push reasonable suspicion to the breaking point to say that anyone who did those things in that area would be subject to an investigatory stop, even a brief one.

Here, however, Brown then saw—soon after Green left—yet another person do the same thing: get in and out of the Mini Cooper quickly and clutch something in his pants. Tr. at 13:1–12. This second encounter happened even as the agents were following Green away from the Mini Cooper. *See id.* at 37:12–21. At this point, then, based on having seen drug deals happen this way before in a high-drug-sales area, the agents did have reasonable suspicion that both Green and the second man had engaged in drug deals. Of course there are innocent explanations of why the Mini Cooper's driver would receive two visitors to his car like this. But just the same, based on the experience of Officer Brown—who had seen drug deals done this way and in this area—it was reasonable to suspect that a driver who provides something to two

9

visitors in separate less-than-one-minute meetings in rapid succession in that area had engaged in drug deals with them. So, at that point, the agents had sufficient reasonable suspicion to make a traffic stop to investigate.

Indeed, soon the quantum of suspicion grew from reasonable suspicion into probable cause. Remember that, after Green drove away from West Maypole, Officer Lecas spotted him and started to follow. Tr. at 73:17–74:2. Lecas saw Green drive through one stop sign, *id.* at 74:21–23, and then, after Lecas had the go-ahead to stop Green, Lecas turned on his lights and siren to make the stop. *Id.* at 75:7–12. Instead of stopping, however, Green drove through the next stop sign too. *Id.* at 75:14–25. On those facts, the Court finds that Green knew a law enforcement officer sought to stop him—yet Green fled and blew the second stop sign. As the Supreme Court explained in *Illinois v. Wardlow*, flight from the police is a relevant fact that increases suspicion because it is the "consummate act of evasion." 528 U.S. at 124; *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) ("erratic driving or obvious attempts to evade officers can support a reasonable suspicion").

It is true, as Green argues, that the cases cited by the government as supporting a finding of probable cause are not all that similar to the facts. here. *See United States v. Morris*, 223 F. App'x 491 (7th Cir. 2007); *United States v. Bennett*, 545 F. App'x 509 (7th Cir. 2011). One of those cases involved suspicious driving, plus the driver discarded what appeared to be empty cocaine packaging with cocaine residue. *Morris*, 223 F. App'x at 495. In the other case, the agents had intercepted phone calls in which the callers used drug code and arranged a meeting. *Bennett*, 545 F. App'x at

10

511–12. So Green is right that the facts of those cases do not really match with the facts here. The lack of a match in facts, however, is not all that surprising, given that probable-cause determinations are intensely fact-specific. *See Ornelas v. United States*, 517 U.S. 690, 698 (1996) (recognizing that, although *de novo* review applies to probable-cause appeals, it "is true that because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, one determination will seldom be a useful precedent for another") (cleaned up). And the relatively brief period of surveillance is not fatal to a probable-cause finding. *See United States v. Funches*, 327 F.3d 582, 586–87 (7th Cir. 2003) (holding that probable cause was supported by approximately one hour of surveillance of parking-lot meeting and relocation to less-visible location at which bag was delivered by intermediary).

Remember too that, generally speaking, police officers are permitted to rely on their experience in making a finding of probable cause. *Ornelas*, 517 U.S. at 700 (explaining that "our cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists") (citing *United States v. Ortiz*, 422 U.S. 891, 897 (1975)); *United States v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015). In combination, then, the circumstances added up to probable cause after Green fled from Officer Lecas:

- the Mini Cooper was parked in a high-drug-sales area, Tr. at 8:6–9, 9:8–15;

- Green and a second person separately got in and out of the Mini Cooper, in rapid succession, holding something after they got out, *id.* at 11:1–6, 11:23–12:5, 13:1–12;

11

- Officer Brown's, Agent Wood's, and Officer Lecas's law-enforcement experience included seeing drug deals happen this way in this area, *id.* at 12:13–19, 14:3–4, 34:20–36:16, 72:19–73:16; and

- after Lecas turned on his lights and siren, Green fled from him and drove through a stop sign to do so, *id.* at 75:7–25.

Again, this is a much closer call than it otherwise would have been had the government offered the facts underlying the GPS tracker's authorization on the Mini Cooper. But probable cause does not set as high a bar as preponderance of the evidence, *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (explaining that "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place" in a probable-cause determination), and instead is a practical inquiry based on the totality of the circumstances, *id.* at 231–32. Given the circumstances and the experience of the officers, after Green fled from Officer Lecas, there was probable cause to believe that Green had engaged in a drug deal.

### 1. High-Crime Areas

In challenging one of the underpinnings of the probable-cause finding, Green argues that routinely labelling certain neighborhoods in Chicago as "high crime areas" disproportionately affects communities of persons of color. Def. Post-Hearing Br. at 5–6. To be sure, it is important to test an officer's testimony on "high-crime" areas lest the designation be made simply *ipse dixit* by any officer about any neighborhood in the City. Worse, implicit assumptions based on demographics might creep into an

officer's view of the quantum of crime in a neighborhood. But Green pursued no challenges against that line of testimony on cross-examination. Brown, Wood, and Lecas all credibly testified that the area in which Green allegedly engaged in a drug deal, that is, the area around the 4700 block of West Maypole, was known for a high volume of drug sales based on their prior experience working that area. Tr. at 9:12–17,12:17–19; 32:20–25, 35:10–14, 72:12–18. And the Seventh Circuit has pointed out that no precedent supports the proposition that "the government must produce 'specific data' establishing that a location is a 'high-crime area.'" *Baskin*, 401 F.3d at 793. Nor is geographic precision required. *See United States v. Adair*, 925 F.3d 931, 936–37 (7th Cir. 2019) (rejecting the defense argument that the true high-crime area was in an area 900 feet away from the arrest). So, based on the uncontroverted testimony, the government sufficiently proved that the alleged drug deal took place in a high-drug-sales area.

### 2. Collective Knowledge

The other necessary pillar to the probable-cause finding is worth a brief discussion too. By relaying his observations in real-time via radio, Officer Brown supplied the Strike Team with "collective knowledge'" of the initial in-and-out visits to the Mini Cooper that formed the first grounds for reasonable suspicion. Under the collective-knowledge doctrine, an officer may "stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). "In

13

order for the collective knowledge doctrine to apply, (1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Id.* at 252–53.

The collective-knowledge doctrine applies here because members of the Strike Force maintained radio communication throughout the day. *See* Tr. at 12:20–13:3, 37:2–15, 74:22–23; *United States v. Parra*, 402 F.3d 752, 766 (7th Cir. 2005) (imputing collective knowledge to a team of officers who closely monitored a drug transaction and maintained frequent communication throughout); *United States v. Rodriguez*, 831 F.2d 162, 165–66 (7th Cir. 1987) (explaining that a state trooper had reasonable suspicion to make a traffic stop based on the request of a DEA agent who had articulable suspicion of drug trafficking); *United States v. Longmire*, 761 F.2d 411, 419–20 (7th Cir. 1985) (holding that officers had reasonable suspicion for traffic stop where the car and occupants matched descriptions transmitted by other officers). Lecas and Norris acted in objective reliance on the information they received from Brown, whose real-time observations provided sufficient facts supporting reasonable suspicion of a drug deal, and formed the premise of probable cause along with Green's flight.[4] Tr.

---

[4] No one testified directly that Agent Norris (who cut Green off at the intersection) heard the pertinent radio communications. But circumstantial evidence sufficiently proves it. Officer Brown testified that he maintained radio contact with "other members of the task force" shortly after naming the members of the team on surveillance that day, including Norris. Tr. at 8:19–9:7. Norris was among the officers who first attempted to pursue Green after Green drove away from West Maypole. *Id.* at 36:20–25. Wood testified that Lecas was holding off on conducting a traffic stop "until myself and Agent Norris could get within his area." *Id.* at 38:1–12.

14

at 9:3–7, 12:20–13:3, 72:12–74:2. And although the stop was intrusive, it was no more intrusive than necessary. Agent Norris blocked Green's Pontiac so that Lecas could approach the stopped vehicle, and because Green was fleeing at that point. *Id.* at 76:4–77:11. So the collective-knowledge doctrine applies to the stop of Green.

### C. Custodial Stop

Although there was probable cause to stop Green (and probable cause to search the car, as explained later), whether Green's statements to officers right after the stop are admissible is another matter. The key question is whether Green was in "custody" for purposes of receiving *Miranda* warnings. Remember that Officer Lecas did not provide *Miranda* warnings to Green before asking if "there was anything on his person or in the vehicle that shouldn't be in the vehicle." Tr. at 77:20–21. Green admitted that there was "dope" in the car. *Id.* at 77:20–24. If the stop was custodial, then the Strike Force was required to provide *Miranda* warnings to Green before interrogating him. *United States v. Higgins-Vogt*, 911 F.3d 814, 820 (7th Cir. 2018). The government contends that the traffic stop was non-custodial. It is true that routine traffic stops typically are non-custodial—but not this one.

"Custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012) (cleaned up). "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to ter-

15

minate the interrogation and leave." *Id.* at 509. (cleaned up) "And in order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation." *Id.* (cleaned up). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Id.* (cleaned up).

Given that the key inquiry is whether the circumstances are so coercive that a person in effect cannot exercise free will to refuse to answer questions, the Supreme Court has held that routine traffic stops for roadside questioning are not custodial for purposes of *Miranda* warnings. *Berkemer v. McCarty*, 468 U.S. 420, 437–39 (1984). *Berkemer* identified two features of ordinary traffic stops that "mitigate the danger" of coerced answers. First, the "vast majority of roadside detentions last only a few minutes," in line with drivers' expectations that that being pulled over typically will require answering a few questions and, perhaps, receiving a traffic citation—then the driver will be free to go again. *Id.* at 437–38. Second, the public nature of traffic stops, with pedestrian and other drivers passing by, also mitigates, "at least to some degree," the danger that the stopped driver will feel coerced by the typically "one or at most two" officers making the routine traffic stop. *Id.* at 438–39.

What happened to Green was not a routine traffic stop. Remember that Agent Norris drove in front of Green to cut him off. Tr. at 76:4–14. Norris had to speed up in front of Green's Pontiac to stop him. *Id.* at 39:14–18. This was after Officer Lecas

16

had turned on his lights and sirens in pursuit of Green. *Id.* at 75:10–15. So not only did Green have Lecas behind him, but another agent sped up, coming from another direction, to cut Green off. After getting cut off like that, no reasonable person would think this was a routine traffic stop. Under those circumstances, it would have been difficult to exercise the right against self-incrimination and boldly refuse to answer questions during the stop.

The government's reliance on *United States v. Khan*, 937 F.3d 1042 (7th Cir. 2019), is inapt. There, a detective pulled over the defendant, Mohammad Khan, around one block from Khan's home and asked him to step out of the car. *Id.* at 1048. The detective told Khan that he was being detained for an FBI investigation and asked if Khan was armed. *Id.* Khan admitted to having a loaded gun in the car without a concealed carry license. *Id.* On those facts, the Seventh Circuit held that Khan was not in custody for purposes of *Miranda* warnings because Khan submitted "no evidence showing that he was subjected to a stop more excessive in duration, scope, or degree of intrusion than that needed to carry out the reason for the stop—an investigation triggered by his online threats to shoot people from his car." *Id.* at 1054. Put another way, on the record in *Khan*, the detective simply pulled over Khan like any other driver in a routine traffic stop. That is not what happened with Green, who was cut off from the front by Norris while being pursued by Lecas from behind. *See also United States v. Ruiz*, 785 F.3d 1134, 1145 (7th Cir. 2015) (explaining that flanking the defendant's car with vehicles is on the "'custodial' side of the ledger," although ultimately holding that the defendant was not in custody). Because Green was in

17

custody at the scene right after the stop, and because he was not given *Miranda* warnings there, the admissions that he made at the scene—namely, that there was dope in the car, and that the dope was in the center console—are inadmissible.

### D. Probable Cause to Search the Car

Although Green's admission about the dope was obtained in violation of *Miranda*, the actual seizure of the heroin is still valid under the Fourth Amendment because the officers still had probable cause to believe that evidence of the drug deal would be in the car. (The government explicitly argues this in the post-hearing brief. R. 64 at 10–11 & 8, n.8.) As explained earlier in the Opinion, even without Green's admission, the circumstances of the in-and-out visitors to the Mini Cooper, the high-drug-sales area in which it happened, and Green's flight from Officer Lecas establish probable cause that Green had engaged in a drug deal. Given that Green had not made a stop after the deal where he could have taken the drugs out of the car, the officers had probable cause to believe that the drugs would still be in there. The automobile exception to the Fourth Amendment's warrant requirement allows police to search a car without a warrant when they have probable cause to believe it contains contraband or evidence of a crime. *United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003). Just so here. With probable cause established, the officers did not need a warrant to search the car, so the suppression motion is denied as to the seizure of the heroin and any other evidence in the car.

### E. Post-Arrest Statements

Lastly, Green moved to suppress *all* of his post-arrest statements, presumably including the statements made at the police station—but he did not develop an argument beyond the suppression of the statements made right after the stop. Def. Mot. Supp. at 1. More to the point, Green did not argue that the police-station admissions—which were made after the officers provided *Miranda* warnings to Green— were inadmissible given the failure to provide *Miranda* warnings right after the traffic stop. Perhaps Green did not mount a developed challenge to the police-station confession because he was provided both a verbal recitation of *Miranda* warnings and a written *Miranda* advice-of-rights form—and he signed it. *Id.* 47:2–25; Gov. Exh. 4. Indeed, Green did much more than just make admissions; Special Agent Wood testified credibly about Green's expressed desire to cooperate with law enforcement at this point. *Id* at 47:22–25; Gov. Exh. 7. In any event, without a developed argument against the police-station statements, they are admissible given the evidence of voluntariness.

### III. Conclusion

Green's motion to suppress is denied in large part and granted in limited part. The only evidence that must be suppressed are Green's statements made right at the scene of the stop, namely, the admission that there was dope in the car and that it

19

was in the center console. All other evidence and the police-station statements made after *Miranda* warnings were provided are admissible.

                                              ENTERED:

                                              s/Edmond E. Chang
                                    Honorable Edmond E. Chang
                                    United States District Judge

DATE: April 5, 2021